UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Hao Zhe Wang

_____

Write the full name of each plaintiff.

-against-

National Association of Realtors, The Real Estate
Board of New York, Inc., HomeServices of America,
Inc., Compass, Inc., eXp World Holdings, Inc., Douglas
Elliman, Inc., Halstead Real Estate LLC, Brown Harris
Stevens Residential Sales, LLC, Realty One Group, Inc

_____

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

24 ___CV 2371 _____

(Include case number if one has been
assigned)

**COMPLAINT**

Do you want a jury trial?
☑ Yes    ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

## I.  BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑  **Federal Question**

☐  **Diversity of Citizenship**

## A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

Sherman Act

## B.  If you checked Diversity of Citizenship

### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
                    (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Hao | Zhe | Wang |
|---|---|---|
| First Name | Middle Initial | Last Name |

| PO Box 7075 | | |
|---|---|---|
| Street Address | | |

| New York | New York | 10150 |
|---|---|---|
| County, City | State | Zip Code |

| 6173206448 | |
|---|---|
| Telephone Number | Email Address (if available) |

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

National Association of Realtors

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

430 North Michigan Ave

Current Work Address (or other address where defendant may be served)

| Cook County, Chicago | IL | 60611 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

The Real Estate Board of New York, Inc.

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

570 Lexington Avenue, FL 2

Current Work Address (or other address where defendant may be served)

| New York County, New York | NY | 10022 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

Compass, Inc.

| First Name | Last Name | |
|---|---|---|

Current Job Title (or other identifying information)

110 Fifth Avenue, 4th Floor

Current Work Address (or other address where defendant may be served)

| New York County, New York | NY | 10011 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 4:    **Brown Harris Stevens Residential Sales, LLC**

First Name                          Last Name

Current Job Title (or other identifying information)

**770 Lexington Ave**

Current Work Address (or other address where defendant may be served)

**New York County, New York   NY                    10065**

County, City                          State                    Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:    Massachusetts, New York, District of Columbia, New Jersey

Date(s) of occurrence:    2014-present

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

See attached

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

See attached

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

See attached

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 2024.3.28 | | |
| --- | --- | --- |
| Dated | | Plaintiff's Signature |
| Hao | Zhe | Wang |
| First Name | Middle Initial | Last Name |
| PO Box 7075 | | |
| Street Address | | |
| New York | NY | 10150 |
| County, City | State | Zip Code |
| 6173206448 | | |
| Telephone Number | | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes    ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**Full List of Defendants**
Realty One Group, Inc
23811 Aliso Creek Road, Suite 168
Laguna Niguel, CA 92677

Brown Harris Stevens Residential Sales, LLC
770 Lexington Ave
New York, NY 10065

Halstead Real Estate LLC
127 West Shore Blvd
Newark, NY 14513

Douglas Elliman, Inc.
4400 Biscayne Boulevard
Miami, Florida 33137

eXp World Holdings, Inc.
2219 Rimland Drive, Suite 301
Bellingham, WA 98226

Compass, Inc.
110 Fifth Avenue, 4th Floor
New York, New York 10011

HomeServices of America, Inc.
6800 France Ave S
Suite 610
Edina, MN 55435

The Real Estate Board of New York, Inc.
570 Lexington Avenue, FL 2
New York, NY 10022

National Association of Realtors
430 North Michigan Ave
Chicago, IL 60611

**Complaint**

1. Plaintiff, currently a New York resident, sues National Association of Realtors ("NAR"), The Real Estate Board of New York, Inc. ("REBNY"), as well as the following real estate brokerages, for agreeing, combining and conspiring to

impose, implement and enforce anticompetitive restraints that cause Plaintiff to pay inflated commissions on the purchase and sale of his homes, in violation of federal and state statutes in Massachusetts, New York, District of Columbia and New Jersey.

2. NAR has over 1.5 million individual members and is one of the largest lobbying groups in the country, advocating for the interests of real estate brokers. It has collected hundreds of millions of dollars in dues and membership fees. NAR oversees fifty-four state and territorial realtor associations. Around 1,200 local realtor associations are members of, and overseen by, NAR. NAR is headquartered in Chicago, Illinois.

3. REBNY has been the trade association for residential real estate brokers, agents, building owners, managers, and developers for Manhattan. REBNY members include approximately 810 brokerage firms and 15,000 real estate professionals. REBNY is headquartered in New York, New York.

4. HomeServices of America, Inc. ("HSA") is "one of the largest residential real estate brokerage firms in the United States." HSA is incorporated in Delaware and headquartered in Minnesota. HSF Affiliates has operated many real estate franchise networks, including Berkshire Hathaway HomeServices and Real Living.

5. Compass, Inc. ("Compass") is a publicly-traded company incorporated in Delaware with its principal place of business in New York. It provides residential real estate brokerage services.

6. eXp World Holdings, Inc. ("eXp") is a publicly-traded company incorporated in

Delaware with its principal place of business in Bellingham, Washington. eXp has brokerages in all 50 states in the United States residential real estate market.

7. Douglas Elliman, Inc. ("Douglas Elliman") is a publicly traded real estate brokerage company incorporated in Delaware with its principal place of business in New York.

8. **Realty One Group, Inc.** ("Realty One"), is a real estate brokerage firm headquartered in **Laguna Niguel, California.**

9. Halstead Real Estate LLC ("Halstead Real Estate"), is a real estate brokerage firm headquartered in New York, New York.

10. Brown Harris Stevens Residential Sales, LLC ("BHS") is a real estate brokerage firm headquartered in New York, New York.

11. Upon information and belief, the brokerages are or were all NAR members, and Halstead Real Estate, Compass, BHS, and Douglas Elliman are or were REBNY members.

## REAL ESTATE LISTINGS, BROKERAGES, AND COMPENSATIONS

12. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors that agree to comply with the rules of the MLS. The vast majority of MLSs are owned and operated by local realtor associations that are affiliated with, and governed by, NAR.

13. One notable exception is the Residential Listing Service ("RLS") operated by REBNY. The RLS offers an MLS-like service in New York City, the dominant

listing service in the city.

14. Listing brokers list their client's property on an MLS as required by a NAR rule (or on New York's RLS, as required by REBNY's rules, which were substantially identical to NAR's) and to ensure that buyer-brokers and prospective buyers are aware of the property. MLSs and RLS also act as the main source of listings for online websites, such as Zillow, through which many prospective buyers find homes. A home that is not listed on an MLS is very hard to find for prospective buyers. Virtually all the homes an unrepresented buyer can find for herself through Zillow or Google searches are going to be properties that are made available through an MLS. If a listing broker does not list a client's property on an MLS, most buyers will not see the property on Zillow or other home search sites and most buyer brokers will not show that property to prospective buyers.

15. To have one's home listed on an MLS or the RLS, a home seller nearly always must hire a listing broker, a due-paying member of the local realtor association that runs the local MLS. In addition to creating the listing for the property, the broker may advise the seller on the listing price, on making home improvements, on furnishing, staging and photographing the property, all of which may be more useful to some, perhaps less experienced, home sellers than to others. The broker also does showings and solicits bids and offers from buyer brokers and passes them onto the seller and advises the latter on negotiating the sale price and the closing process, which would also be more useful to less experienced sellers than to more experienced sellers.

16. Most brokers and agents occupy dual roles: they simultaneously operate as listing brokers for some home sales and as buyer-brokers for other home sales. In buying a home, some buyers start the process by hiring a buyer broker or buyer agent who identifies listings that suit the buyer's budget and other considerations such as location and size. In recent years, however, buyers increasingly start their house-hunting on Zillow, Streeteasy, or similar online tools; some buyers even go to open houses on their own.

17. Invariably, however, buyers must be represented by brokers before they can put in an offer for the property. Significantly, whereas prior to mid-1980's the defendants required all realtors to pass onto the sellers offers presented by unrepresented sellers, in recent decades unrepresented buyers trying to present an offer on their own would be rejected by the listing brokers who cite "ethical" rules promulgated by the defendants about not dealing with unrepresented buyers. The rejection is always followed by either an offer by the listing broker to become the buyer agent – with the broker in effect becoming a dual agent, representing both sides of the transaction – or a request that the buyer hire the listing broker's colleague or employee to be the buyer agent.

18. Once an offer is submitted, a buyer broker negotiates with the listing broker on the buyer's behalf; in the event of a dual agent, of course, a buyer essentially negotiates on her own behalf with the listing broker. And after an offer is accepted, the buyer broker advises the buyer on hiring home inspectors, title insurance company, and other products and services needed or recommended before the closing of the sale. The buyer broker's advice and assistance would be

more useful to some, perhaps less experienced, buyers than to others.

19. Commissions to the listing broker and the buyer broker are paid – along with fees and charges by other vendors such as the lender, mortgage broker, attorneys, title insurers, etc. – when the home sells and on the day of closing. Unlike a closing attorney, a land surveyor or a home inspector who usually advertises or negotiates a fixed price with the buyer or seller, the brokers' compensation in the residential real estate industry is calculated as a percentage of a home's sale price. And that sale price usually deviates from the listing price, sometimes drastically, and the price may also change during the closing process if the buyer discovers some defects with the property through home inspection and gets a discount or if the seller of a new-build convinces the buyer to pay for additional amenities or features. So the brokers' compensation is not determined until the seller and buyer agree on the final purchase price.

20. But the commission *rate*, the percentage peg of the brokers' compensation to the final sale price, is fixed long before the seller and buyer meet and before the property is listed or before the buyer even finds her own agent. Pursuant to the defendants' rules and regulation for their members, subsidiaries, franchisees, employees and affiliates, the brokers should have the seller nominate a commission rate for both the seller's agent and the buyer agent before listing the seller's property on MLS or RLS. NAR's Buyer Broker Commission Rule and a similar rule by REBNY obligated a listing broker, on behalf of the seller, to set the commission rate for both brokers when listing a home on an MLS owned by a local realtor association. If a buyer represented by a broker purchases the home,

the buyer broker receives the commission.

21. To the extent that the buyer had no role in setting the commission rate for her own broker or even knows the rate, the same rules and regulations have long permitted realtors to tell the buyer that buyer representation is free, and some brokerage defendants apparently trained their realtors to do so.

22. At closing, a number of costs on top of the home purchase price are paid and settled. On the day of closing, the attorneys (or a title or closing agent) receive funds from the buyer and/or her lender and disburse the funds to the seller (and/or her creditors) and pay the closing costs for the lender, mortgage broker's fees, title fees, the listing broker's fees, the buyer broker's fees, the attorneys' own legal fees, and sometimes fees and charges from other vendors whom the buyer or the seller has hired and who have agreed to be paid at the time of closing (e.g., home inspector, land surveyor, oil tank inspector, septic tank inspector, lead inspector, and sometimes plumbers or electricians who performed repairs when the home was under contract).

23. Yet, in contrast to the costs of the buyer's attorney, mortgage broker, or home inspector, which are usually agreed upon before hiring and which are clearly marked on the buyer's closing statement, the amount of compensation for the buyer broker is not shown on the buyer's closing or settlement and is typically not listed as a line item. This perpetuated the impression that buyer brokerage was all a freebie to the buyer. Only in the past year and amid a litany of legal troubles did the defendants take to change their "ethical" rules to ban the misrepresentation about "free" buyer representation among the ranks of their agents and brokers and

to publicly acknowledge that buyer brokers are not free.

**PLAINTIFF'S REAL ESTATE TRANSACTIONS AND EXPERIENCE**

24. Plaintiff has bought and sold residential real estate numerous times.

25. In 2014, Plaintiff identified a home for purchase in Massachusetts through searches on Zillow. He scheduled a viewing with the listing broker, a Berkshire Hathaway HomeServices broker, and was first questioned whether he was represented by a buyer agent. When he said no, the listing broker met him at the property for the showing. Plaintiff indicated his intention to make an offer for the property during the showing, at which point the broker indicated that Plaintiff must sign a dual agent agreement before she was permitted by rules to take his offer to the seller. Plaintiff did, made an offer through the listing broker, negotiated the price through the broker, and eventually closed at the price of about $385,000.

26. Later that year, Plaintiff identified a second Massachusetts home listing of some interest on Zillow. He scheduled a viewing with the listing broker and was first questioned whether he was represented by a buyer agent. When he said no, the listing broker met him at the property for the showing. Plaintiff was not keen on that property after the showing, at which point the listing broker asked Plaintiff to hire him as a buyer agent, presenting himself as a senior official of the local Realtors association, an NAR subsidiary, and that his service would be free to a buyer like Plaintiff, even if Plaintiff ended up not buying any property. Plaintiff

thus signed a buyer broker agreement with him and subsequently bought a property at the price of about $400,000.

27. In 2018, Plaintiff identified an apartment for purchase in New York City through searches on Zillow. He scheduled a viewing with the listing broker, a Douglas Elliman broker, and was first questioned whether he was represented by a buyer agent. When he said no, the broker sent an assistant to show him the apartment. Plaintiff indicated his intention to make an offer for the property and scheduled a second visit to the apartment, at which point Plaintiff met with the listing broker in person. She indicated that Plaintiff must sign a dual agent agreement before she could pass on his offer to the seller. Plaintiff did, made offer through the listing broker, negotiated the price through the broker, and eventually closed at the price of about $1,150,000.

28. Later that year, Plaintiff engaged an HSA broker to list one of his Massachusetts properties for sale. Plaintiff and the broker executed an exclusive MLS listing agreement that stipulated compensation for both listing and buyer brokers. The property eventually sold for about $350,000.

29. In 2019, Plaintiff identified a home for purchase in District of Columbia through searches on Zillow. He scheduled a viewing with the listing broker, an eXp broker, and was first questioned whether he was represented by a buyer agent. When he said no, the listing broker met him at the property for the showing. Plaintiff indicated his intention to make an offer for the property during the showing, at which point the broker indicated that he must become a dual agent before he could pass on Plaintiff's offer to the seller. Plaintiff consented, made an offer

through the listing broker, negotiated the price through the broker, and eventually closed at the price of about $496,091.

30. Later that year, Plaintiff identified another home for purchase in District of Columbia through searches on Zillow. He scheduled a viewing with the listing broker, a Compass broker, and was first questioned whether he was represented by a buyer agent. When he said no, the listing broker met him at the property for the showing. Plaintiff indicated his intention to make an offer for the property during the showing, at which point the broker indicated that Plaintiff must retain her colleague, a second Compass broker, in order to bid on the property. Plaintiff engaged that second Compass broker as his buyer broker, made offer for the apartment but did not eventually enter a Purchase & Sales agreement with the seller. Nevertheless, the buyer broker indicated that she would like to continue to represent Plaintiff for free until he closes on a deal, and Plaintiff thus agreed to keep her. Soon afterwards, Plaintiff bought a different property through the buyer broker at the price of about $449,900.

31. In 2022, Plaintiff identified a home for purchase in New Jersey through searches on Zillow. He contacted the listing broker to request a showing and was first questioned whether he was represented by a buyer agent. When he said no, the broker indicated that he must be represented by a second broker, an employee in the first broker's office, before he could see that property or make an offer on it. Plaintiff agreed to hire that the listing broker's employee as the buyer broker before he makes an offer. He subsequently met with that employee at the property and indicated his intention to make an offer for the property, at which point

Plaintiff made an offer on the property through the second broker. The final purchase price was about $655,000.

32. Later that year and then again in 2023, Plaintiff engaged an HSA broker to list two of his Massachusetts properties for sale. Plaintiff and the broker executed exclusive MLS listing agreements for the two properties that stipulated commission rates for listing and buyer brokers. Together, the two properties eventually sold for about $587,000 and closed in 2022 and 2023, respectively.

33. Also in 2023, Plaintiff identified a home for purchase in New Jersey through searches on Zillow. He scheduled a viewing with the listing broker, a Compass broker, and was first questioned whether he was represented by a buyer agent. When he said no, the broker sent an employee to show him the property. Plaintiff indicated his intention to put in a bid for the property, at which point the broker told Plaintiff that he must sign a dual agent agreement before he could accept his bid. Plaintiff did, submitted the winning bid, and eventually closed at the price of about $782,000. Interestingly, the listing broker represented that his service as a buyer agent would include the "Audit Compliance Processing", which encompasses the handling and storage of all the documents related to the closing, and would cost Plaintiff $750. The $750 was eventually included in Plaintiff's closing cost and printed on his settlement statement as a line item, even though the commission for the buyer broker was not printed on the statement.

34. Plaintiff often identified dozens of properties of interest before each purchase and sometimes had to bid for multiple properties before winning one. Plaintiff has thus contacted hundreds of listing brokers, and the conversations they had with

him always turned into their professional "ethics" of not taking offers from unrepresented buyers and about Plaintiff's need to use the listing broker as a dual agent or a colleague or employee of the broker as his buyer agent. In shopping for the New York home in 2018, for example, he also viewed properties listed by Compass, BHS, and Halstead Real Estate brokers, all of whom told him he needed to retain the listing brokers themselves as buyer brokers before he could bid on their listings. In buying the New Jersey property in 2023, he also viewed properties listed by Realty One brokers who told him he must retain them as buyer brokers before he could bid on their listings.

35. As a repeat home buyer and seller, Plaintiff typically brought his own vendors to the table instead of relying on the broker's recommendations. In selling the properties, Plaintiff usually brought in his own plumbers or electricians or contractors to make repairs or home improvements that he deemed necessary for marketing the properties for sale. In buying the properties, Plaintiff had his own attorneys, home inspectors, land surveyor, lead paint inspector, and mortgage broker at the ready and did not solicit or receive advice from the buyer brokers. In purchasing properties, Plaintiff usually did his own research before approaching each listing broker. During subsequent price negotiations with sellers Plaintiff rarely solicited advice from the buyer brokers, nor did he trust unsolicited advice that he received from them, because the brokers were either the listing brokers themselves or their employees whose loyalty may be divided. Even in selling his properties Plaintiff relied on his own research in setting the listing price and on his own instinct and experience in negotiating with prospective buyers.

**DEFENDANTS' RULES AND REGULATION OF REALTORS AND THE CREATION AND ENFORCEMENT OF THE RULES**

36. The pillar of NAR, REBNY and their co-defendants' power is their control of the local MLSs (or the RLS in New York). Almost all residential homes for sale in the United States – about 90% – came to the market via the MLS. Those not listed risk being totally invisible to prospective buyers. Only due-paying realtors were allowed to list a property on the MLS, and in doing so they were required to subscribe and adhere to a set of "ethics" rules created and enforced by NAR and its co-Defendants.

37. The rules included requirements 1) that listing brokers accept offers for their listings only from represented buyers; 2) that compensation for buyer brokers be set at the time of listing and the scale of compensation be made known to buyer brokers but usually not to buyers; 3) that buyers not be allowed to negotiate the commission rate set in the listings; and 4) that by default the listing brokers and buyer brokers receive equal or similar compensation.

38. Regarding the first rule, prior to 1987, NAR's Code of Ethics and Standards of Practice required listing brokers to pass on offers made by a buyer broker as well as offers made by the prospective buyers themselves. Standard of Practice 7-1 in both the 1985 and 1986 editions of the Code of Ethics says "The REALTOR® shall receive and shall transmit all offers on a specified property to the owner for his decision, whether such offers are received *from a prospective purchaser or another broker*." Emphasis added. The rules at the time clearly contemplated

listing brokers' interaction and dealing with unrepresented buyers and mandated that they accept and transmit offers made by these buyers as well as offers made through buyer brokers. But this language was dropped from 1987 onwards: instead, the universal refrain among listing brokers has been that their professional ethics now forbids them from taking offers from an unrepresented buyer until he retains representation, a line that hundreds of listing brokers, including both NAR and REBNY members, uniformly repeated to Plaintiff in slight variations.

39. Regarding the second rule, NAR's Handbook on Multiple Listing Policy stated the Buyer Broker Commission Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further stated that "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships." Although REBNY seceded from NAR in 1990's, it has had similar rules in force for RLS listings.

40. Notably, the listing information that the MLSs feed to Zillow and other home search websites is a stripped-down version that usually excludes the commission information for buyer brokers. The same information is usually also excluded

from the purchase and sale agreements that brokers prepare for sellers and buyers to sign, and the information is excluded even from closing or settlement statement after money changes hand, leaving buyers in the dark throughout the process and forever afterwards.

41. Regarding the third rule, NAR Standard of Practice 3-2 stated: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." NAR's rules restrained negotiation of the buyer-broker commission by providing that after the seller has received purchase offers, the listing broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally reduce the buyer broker commission originally listed.

42. NAR took additional actions to restrain such negotiations even further. NAR's ethical rules and its interpretations thereof expressly prohibited buyer-brokers from attempting to reduce buyer-broker commissions offered on MLSs through the submission of purchase offers. NAR's Standard of Practice 16-16 stated: "REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the

listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." It was thus an unequivocal violation of NAR's ethics rules for a buyer broker to even present an offer to a seller that is conditional on the seller reducing the buyer broker commission. REBNY has had similar rules in force.

43. **Regarding the fourth rule,** until recently, the RLS rules created a default rule that the compensation offered to buyer brokers would be the same as the compensation received by the listing broker. In negotiating listing services with many NAR member-realtors when selling his properties, Plaintiff usually received draft agreement that set the commission for buyer brokers at 50% of the total commission. NAR, REBNY, and their co-defendants thus appear to have trained all their members to default to equal pay for listing and buyer brokers in creating MLS or RLS listings.

44. All Realtors in the United States are subject to NAR rules. All New York-area brokers are subject to the largely similar REBNY rules. NAR issues its Code of Ethics that is binding on all REALTORS®, regardless of whether they operate in a NAR-affiliated MLS or an MLS not affiliated with NAR. REBNY similarly publishes professional ethics rules that it enforces on all New York City brokers that access REBNY's RLS. Both REBNY and NAR also required the defendant brokerages as well as other brokerages not named in this suit to comply with their policies and assessed penalties against violations of their rules.

45. Because access to the MLSs/RLS is a commercial necessity for brokers and

individual realtors, all brokers and individual realtors located must comply with NAR and REBNY's mandatory provisions. Without access to RLS in New York City or a similar local MLS, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

46. NAR establishes and disseminates model rules for local realtor associations, and for the MLSs that these local associations own and/or operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

47. NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

48. For many years, NAR  successfully required its affiliates, including state and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned or operated by local realtor associations, to fully comply with the above rules, and with other rules contained in the NAR Handbook on Multiple Listing Policy and the NAR Code of Ethics. REBNY had similar success in enforcing its own rules among New York City brokerage firms and individual agents.

49. NAR required its affiliates that own and/or operate an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook stated that an agreement by an

association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

50. NAR threatened its individual and associational members with expulsion for failing to comply with the Code of Ethics. NAR's Code of Ethics stated that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

51. Local realtor associations were required by NAR to monitor their MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Thus, each local realtor association and MLS agreed to the commission rate negotiation restraints and played a central role in implementation and enforcement of those restraints.

52. One of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatened to withhold these valuable insurance benefits from realtor associations and MLSs that fail to comply with these mandatory provisions. NAR's Handbook on Multiple Listing Policy provided that "Association and Association-owned MLSs must conform their governing documents to the

mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as members boards and to ensure coverage under the master professional liability insurance program." NAR's Handbook stated that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

53. Lastly, the brokerage defendants also agreed to implement and enforce NAR and REBNY rules. Each brokerage defendant mandated or encouraged its franchisees, affiliates, and realtors to join NAR or REBNY, subscribe to the trade associations' professional rules and ethics. Each brokerage defendant required its realtors and franchisees to abide by these rules as a condition of doing business with the national brokerage and to secure the benefits of the national brokerage's brands, infrastructure, and other resources that support individual broker or agent's operations.

54. HSA required its franchisees and realtors to comply with NAR rules and regulations, including the Buyer Broker Commission Rule and stated that it "support[ed] the Realtor Code of Ethics [and] the Multiple Listing Rules," required all associates to belong to a local realtor association and MLS, and stated that the company's commission expectation will be calculated based on 3% for the listing broker and 3% on the selling side.

55. Compass stated that "Aside from federal, state and local regulations, we are subject to a variety of rules promulgated by trade organizations including the

NAR, state and local association of REALTORS, and [MLSs]. Generally, as members of these organizations, we are subject to their policies, bylaws, codes of ethics, and fees and rules, which govern our dealings with other members, the public, and clients as well as the manner in which we use and display the organization's brand and services. We have a dedicated team that works with a variety of stakeholders, including our brokers of record, to help manage and comply with these rules and policies."

56. eXp committed to following NAR's rules and policies, too. It stated: "We primarily serve the residential real estate industry, which is regulated by federal, international, state, provincial and local authorities as well as private associations or state sponsored association or organizations. We are required to comply with federal, state, provincial and local laws, as well as private governing bodies' regulations, which combined results in a highly-regulated industry.

57. Douglas Elliman also admitted that "Through our brokerages, we participate in MLSs and are a member of the National Association of Realtors ("NAR") and state real estate associations and, accordingly, are subject to each group's rules, policies, data licenses, and terms of service."

58. Of course, like all trade associations, NAR and REBNY are made of members and their rules and policies created by these very members who are then policed for their own adherence to the rules. The defendant brokerages are among the nation's largest brokerages and do not just passively follow the diktats of NAR and REBNY; their executives also occupy top leadership positions at NAR and

REBNY and sit on important committees that formulate the ethics rules that their brokerages then enforce on their affiliated brokers and agents. The defendant brokerages pride themselves in the influence they wielded in shaping NAR and REBNY's rules and policies outlined above.

59. In setting forth the ethical rules, NAR and REBNY invited the brokerage defendants and other brokers to participate in crafting the rules and MLS/RLS policies. In turn, these brokerage defendants and their peers looked to steer the rule-making to benefit themselves and their employees and franchisees, even though they understood that they could reap the maximum benefits only if they adhered to the rules themselves and enforced the rules among their own employees and franchisees.

60. The brokerage defendants helped implement the rules in at least four ways: (1) their executives and franchisee representatives attended NAR and REBNY meetings, supervise NAR's and REBNY's operations, and review, lobby for, and vote on the rules; (2) their and their franchisees assisted in the enforcement of the rules; (3) they required their brokers, agents, and franchisees (and the agents or realtors employed by those franchisees) to comply with the rules; and (4) they and their affiliated brokerages, through their participation in MLSs and their officers' and employees' membership in NAR, agreed to adhere to the rules.

61. First, representatives from each of the brokerage defendants and their franchisees regularly attended NAR and REBNY's meetings and held leadership positions in the trade associations. Their executives have served on the associations' boards of directors. NAR's Real Estate Services (RES) program,

for example, "works closely with large firm representatives to better understand their business interests and to identify how NAR can bring them tangible value. Through RES, diverse real estate services firms are given an avenue to provide meaningful input to NAR." Members of the RES Advisory Group had seats on NAR's Executive Committee and on its Board of Directors. Senior executives of the brokerage defendants or their franchisees have participated in the RES Advisory Group. NAR's Multiple Listing Issues and Policies Committee, which is responsible for reviewing and reissuing the Handbook was chaired by representatives from the brokerage defendants or their franchisees. By virtue of their leadership positions in NAR and REBNY, these and other representatives from the brokerage defendants were responsible for formulating, reviewing, and approving rules like the Buyer Broker Commission Rule. NAR approves and issues a new MLS Handbook annually; changes to NAR's MLS policy and Professional Standards were discussed and approved at NAR's yearly meetings by NAR committees on which representatives from brokerage defendants served. The brokerage defendants assisted NAR or REBNY with ensuring compliance with each association's rules.

62. The brokerage defendants thus agreed to adopt, promote, implement, and enforce the NAR and REBNY's "ethical" rules through their intimate involvement in NAR and REBNY governance and imposition of NAR rules on local real estate associations and the brokerage defendants' affiliated franchisees, brokers and employees. By participating in the two associations that prevented member brokerages from allowing their associates to transmit offers from

unrepresented buyers or to negotiate on the commission rate for buyer brokers, the brokerage defendants played a central role in the implementation and enforcement of the rules.

## DEFENDANTS' PRODUCTS AND MARKET POWER

63. Taken together, the rules that NAR, REBNY and the brokerage defendants created and enforced made it exceedingly difficult for an alternative listing service to appear and compete with the existing MLSs and RLS. Any brokers in the areas in which the MLSs operate who wished to compete outside of the MLSs would face insurmountable barriers. NAR and the brokerage defendants' effective control of the MLSs – and REBNY and the REBNY member-brokerages' control of New York City's RLS – through their local franchisees of the national brokerages, other local brokers, and the local realtor associations means that insurgent brokers would need to establish an alternative listing service, or alternatively, attempt to compete without access to a listing service. A listing broker who represents a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-broker who represents a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot represent and assist their clients and cannot compete effectively without access to a listing service.

64. For an alternative listing service to compete effectively with an MLS or the RLS, the alternative would need to have listings as comprehensive (or at least nearly so) as an MLS. Brokers and their individual realtors who have profited

from the inflated buyer-broker commissions and total commissions under the NAR's and REBNY's rules would have minimal incentive to defect and participate in an alternative listing service that would generate lower buyer broker commissions. As long as most buyers are still advised and can be still shepherded or "steered" by buyer agents, listing brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients. Accordingly, home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers. In the end, the alternative listing service attempting to compete with an MLS would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with the MLSs reflects the very substantial barriers to entry.

65. Yet, even though it is really the broker's access to the local MLS that makes her indispensable, in pitching her service to a client the broker typically just flaunts her knowledge of the local market, skills in negotiation, or experience in guiding her client through closing. Indeed, while the agreement between the home seller and the broker usually encompasses the listing of the home at the local MLS, the agreement would enumerate other functions of the realtor, such as staging or photography of the property and hosting open houses and doing showings. An agreement between the buyer and the broker would not involve the MLS listing service at all and would center on the realtor's other work for the buyer: visiting properties, advising on market and property conditions, and facilitating offers and

the closing. The defendants and their employees, subsidiaries and franchisees peddle all the other work that is done off the information exchange and online listing service – all the legwork in doing open houses and showings, in soliciting, submitting and negotiating offers, and in helping with closing, all the broker services with human interactions – than mere access to MLSs. The defendants and their brokers and agents thus straddle at least two adjacent markets: the access to the MLS, and all the other offline, "brokering" work that is associated with the real estate profession in public perception.

66. NAR itself sees the MLSs and the "offline" services performed by buyer brokers as two distinct types of products and two distinct markets. On its new propaganda website set up in face of the onslaught of lawsuits in recent years, "Real Estate Compensation Facts" (https://www.realestatecommissionfacts.com), it notes that while the information on the MLSs is provided to home search sites like Zillow and made available to the public "for free," brokers must be compensated for the work they perform for buyers: on the one hand, "local broker marketplaces…are the primary source of information for home search sites. Local REALTOR® associations also make most of this information publicly available for free, and each database often feeds home search sites"; on the other, buyer brokers must be paid "to see all the available homes" on buyers' behalves and do the "offline" work typically associated with brokering.

67. The online and offline products are linked, however, at least from NAR's perspective. For NAR warns that the MLS service would degrade or vanish if brokers – whose membership dues pay for the MLSs – do not get paid for their

offline work. In other words, what home sellers and buyers pay for the offline service eventually subsidizes the online listing services' operation and maintenance.

68. It is thus a curious and unnerving phenomenon that all NAR and REBNY's rules and all the efforts that the defendant trade associations and defendant brokerages devoted to enforcing the rules were really meant to protect the dominance of the nominally "free" online product rather than the value and utility of the offline "brokering" services that promise the big payday for the defendants' members, employees, and franchisees. The defendants would be hard pressed to explain why forcing unrepresented buyers to use the listing broker as dual agent before allowing them to make an offer on a property makes realtors more useful to the buyers or why concealing the scale of the brokers' compensation makes the brokers more helpful to the buyers. Sure, NAR and REBNY both claimed to offer members networking, training and educational opportunities that purported to improve the brokers' professional skills, but missing a networking opportunity or an online seminar about real estate photography would not result in financial penalties or expulsion in the way that violating the MLS listing rules would. The rules that defendants crafted and enforced were meant to protect the unassailable market dominance of the "free" MLS, not the value and usefulness of offline "brokering" skills of the NAR and REBNY members.

69. The term "free" thus takes on an entirely different meaning: the MLS is a "free" service because the defendants would not relinquish their control of it at any price. It is this "free" product that NAR- and REBNY-aligned brokers and the brokerage

defendants relied upon to coerce the general home-selling and home-buying public to pay them a cut of 5-6% in every real estate transaction.

70. For home buyers, for example, the "free" MLS feeds, widely spread by Zillow, Streeteasy or Google, are indeed useful information. But the "ethical" rules barring the submission of an offer by an unrepresented buyer and transmission of such an offer means the information is useless to buyers unless they also agree to pay 2.5-3% for buyer's representation that they may or may not want – and they do not get to negotiate the percentage.

71. By the same token, home sellers are hardly ever permitted to pay for a stand-alone "listing" service that just consists of the listing part. Rather, the "listing" service would come with a bundle of distinct "brokering" services: staging, photography, showings, price negotiation, help with closings, etc.

72. In essence, the MLSs are a tying good, and the brokerage services are a different, tied good that may seem an overpriced and not always desirable product to the home-buying and home–selling public. NAR conceded as much on its shiny new propaganda website: most of the information on MLS is available to the public for free, NAR says, but imagine what would happen if the buyer brokers stop getting paid? The doomsday scenario would result in the disappearance of MLSs and all the "free" information and Zillow feeds, NAR admonishes the American public: "No centralized source of available homes for consumers or brokers," "Buyers would have to visit every broker in town to see all available homes," "Outdated home status information," "Fewer homes for buyers to choose from on real estate sites," "Unverified, inaccurate and unreliable property information," "Sellers

would likely have to pay to list and advertise their properties on websites,"

"Buyers unable to afford a buyer broker would have fewer options," and

"Inconsistent broker information in listings across websites".

73. NAR's shrill propaganda at once reveals the defendants' darkest secret: the MLSs

are not a free product, and NAR always needed the home-buying and home-

selling public to purchase a second, distinct but adjacent product from them – the

offline service that involves interacting with buyers and sellers on a human level,

the showings, the price negotiations, and the closings – before they were willing

to let the buyers and sellers use first product. To the extent that virtually all sellers

and buyers needed the first product but not all of them found the second product

useful, the defendants desperately wanted to tie the less desirable product to the

first product.

74. If the defendants wanted the public to believe that their affiliated brokers and

agents deserve to be compensated for their legwork and real estate expertise, they

also showed little effort to compete in this market by offering price cuts or

superior service. Rather, it was the monopoly of the MLSs that they guarded most

jealously and ruthlessly. Even with the formidable barrier to entry by competing

listing services, the defendants protect their monopoly in the listing service

through other means as well. NAR advised MLSs to enter into non-compete

agreements with third-party websites, so that those websites do not become

competitive rivals to MLSs. NAR's checklist of "critical components" stated that

the consumer-facing website "must agree they will not compete with the

brokerage firms or MLS by either becoming a licensed brokerage firm or by

providing offers of cooperation and compensation." The non-compete agreement required the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, NAR advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

75. If a group of insurgent brokers wished to compete with NAR and REBNY members in the offline brokering market, they could compete on cost and need to be able to advertise the price for buyer representation. But such advertisement would immediately run afoul of the MLS listing rules that the defendants collectively drafted and enforced, and the insurgent brokers would lose access to the MLSs.

76. Real competition on the offline brokering service would thus be contingent upon the creation of a competing listing service. Yet, the "ethical" rules promulgated and enforced by the defendants would likewise frustrate that effort as well.

77. To begin with, most buyers use buyer brokers affiliated with the defendants for simple reasons that they have to and that they are told the buyer brokers are free. The defendants, through their training and education of brokers and the "ethical" rules they published and enforced, allowed and even encouraged brokers to pitch buyer's representation as "free" to buyers. Ironically, before the recent wave of NAR propaganda that the MLSs are free and the buyer brokers need to be paid in order to subsidize the free MLSs, NAR took the opposite position that it was the buyer brokerage that was free. Until recently, A buyer broker working outside the strictures of NAR and its co-defendants' code of ethics and the MLS's rules could not possibly compete with a "free" product. Even for the small minority of buyers

who were not enticed by the offer of "free" buyer representation in their house
hunting and who found the need for one solely because they were not allowed to
submit an offer as unrepresented buyers, it is inconceivable that a broker not
aligned with NAR and its co-defendants would miraculously appear out of thin air
amid the buyer's meeting with the listing broker to offer a competing service to
the unrepresented buyer. In reality, the listing broker typically would become the
buyer broker on the spot. Therefore, a buyer broker who competes for business
with those aligned with NAR and its co-defendants could never compete on cost –
at least not on paper – and would never see an opportunity to snatch a client away
from a dual agent so anyway.

78. This bundling or tying of the MLS product to the offline, "brokering" services has
been an enormous success for the latter. From 2015-2022, 86-92% of sellers
listed their homes on an MLS. 86% of sellers sold their home with the
assistance of a real estate broker in 2022, and 86% of buyers purchased their
home with the assistance of a real estate broker in 2022. The dominance of the
MLS also translated into brisk sale and dominance for the brokerage defendants.
In the areas in which the MLSs operated, the brokerage defendants collectively
provided the vast majority of the broker services.

**DEFENDANTS' ILLEGAL TYING AND OTHER ANTITRUST CONDUCT HARMED
PLAINTIFF AS A BUYER**

79. NAR and REBNY's "ethical" rule that listing brokers not transmit offers made by
unrepresented buyers created an illegal and anticompetitive bundling of the

MLS/RLS product and their members' offline buyer brokerage service.

80. Their "ethical" rule that the commission rate for the buyer broker be set in the MLS or RLS listing and before any buyer even shows up at the door also created an artificial, supra-competitive price for the buyer brokerage service.

81. Taken together, NAR and REBNY's rules – created with their co-defendants' input and also implemented and enforced by the brokerage defendants and their franchisees, subsidiaries and employees –harmed Plaintiff as a home buyer.

82. In its early days, NAR (and REBNY, which was a member of NAR until 1990's) did not even see home buyers as potential clients for its members. Its code of ethics spoke of only home sellers when discussing realtors' obligations to "clients" and broadly categorized prospective home buyers as members of "the public".

83. As late as 1986, NAR still contemplated that a listing broker may be approached by an unrepresented home buyer and mandated that an offer from the latter must be presented to the home seller immediately.

84. In recent decades, of course, unrepresented home buyers have had the opposite experience. The NAR and its co-defendants' rules and training meant that a buyer must be represented and take on a buyer agent (which in nearly all cases meant paying the listing broker as the dual agent) before the listing broker would pass on the buyer's offers to the seller. Their "ethics" allowed no exception even for an experienced buyer such as Plaintiff.

85. In other words, in order to access the MLS listings, the dominant product on the market, home buyers are forced by the defendants to pay for a second type of service, namely that of buyer representation. The latter service is imposed on

buyers and often unwanted and undesirable, but the defendants made it clear that in order to make use of its "free" MLS listings in shopping for homes buyers must use the defendants' licensed, franchised, and affiliated brokers to make offers and put in bids for the homes listed on MLS.

86. The coercive tying of the unsavory and undesired product – that of buyer representation – to the workhorse product that is nominally free and that buyers could not sidestep, namely access to listings of homes for sale, is anticompetitive and illegal. The defendants set the rules and regulations and directed their co-conspirators, licensees, franchisees, affiliates, or subsidiaries to deny Plaintiff the opportunity to make offers on properties he was interested in unless and until he agreed to hire buyer agents, which in virtually all the cases meant making the listing broker the dual agent. In a small number of incidents in which the listing broker had agreed in advance with the home seller not to be a dual agent, the broker would still impose on Plaintiff her own choice of the buyer broker, inevitably a colleague or an employee.

87. Consequently, Plaintiff had to settle with a buyer agent whose loyalty was split or, more probably, entirely aligned with the seller and against Plaintiff. This led to disadvantages in negotiating with the sellers and higher costs he had to pay in closing that he would have preferred to avoid.

88. The idea that the "ethical" rules might have intended to serve a moral purpose and to create a level playing field so that a represented party (i.e., the seller) would not get to take advantage of an unrepresented party (namely the buyer) is easily debunked by the fact that an unrepresented buyer who showed up at an open

house and wanted to make an offer almost always ended up with the listing broker as the dual agent whose primary fealty remained with the seller. In other words, in hiring the listing broker as the buyer broker and anointing her as the dual agent, the unrepresented buyer did not buy her loyal service, only the privilege to be able to bid on the home for sale that the listing broker represented.

89. As an experienced home buyer, Plaintiff would have no incentive to use a buyer agent at all. In his purchases, Plaintiff usually identified the properties by doing his own Zillow search and approached the listing brokers directly. Plaintiff had his own team of lawyers, architects, home inspectors, contractors, lead inspectors, and oil tank inspectors and did not solicit or receive advice from the listing brokers in making bids or negotiating contingencies, price cuts, discounts, extensions, or other terms of the sales.

90. Even in a buyer's market in which sellers may indeed have incentives to pay for a range of free items to entice buyers (new appliances, new septic tank, buyer brokerage, a year of home warranty, new flooring, prepaid condo fees, etc.), Plaintiff would then have leverage to ask the seller to simply cut all the frills and give Plaintiff hard cash in the form of a credit at closing. But time and again Plaintiff ran into the phony "ethical" rule that he must have representation before he could submit an offer to sellers and was forced to pay for a product that was of little use to him and he could not trust to use anyway.

91. Worse still, Plaintiff was forced to pay for a product whose cost he could not negotiate. For NAR and REBNY's ethical code also mandated that the commission rates for both buyer and listing brokers be set before the home comes onto the

market.

92. To the extent that not every home buyer is as experienced as Plaintiff and that
    most still depend on buyer brokerage in shopping for homes, hassling over
    price, and navigating through the closing process, a listing may attract more
    showings and more bidders if it promises to pay out more in commission to the
    buyers' guides who would then "steer" their clients to certain properties that
    promise the biggest commission payouts. The Buyer Broker Commission
    Rule's facilitation of steering is also magnified by the Rule's requirement that
    the compensation that home sellers offer to buyer-brokers on MLSs *must* be
    offered as a percentage of the gross selling price or a definite dollar amount and
    by the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to
    other participants to discuss terms and conditions of possible cooperative
    relationships." By requiring that offers of compensation be expressed in specific
    dollar or percentage terms, the Rule ensures that buyer- brokers can easily
    compare the financial compensation offered to them by home sellers and steer
    buyers away from properties offering materially less than the "standard real estate
    commission."

93. Simultaneously, the NAR rules *mandate* price information sharing among
    brokers through its MLS rules. This type of one-way information exchange
    agreement prevents price competition that benefits consumers while allowing
    brokers to put upward pressure on pricing and to punish brokers who deviate
    downwards.

94. And the same "ethical" rules also made renegotiating the commission rate difficult, even if the buyers or the sellers were inclined to do so when they finally met and were negotiating over the sale price.

95. This method of setting buyer broker commissions is wholly different from the practices that would exist absent the "ethical rules." Absent the rules, buyers would have the incentive to set and negotiate buyer broker pricing (where such brokers are used at all), and buyer brokers would compete to be retained by offering lower commissions to their prospective clients for their services. The rules restrain price competition among buyer brokers because their clients, i.e., home buyers, have little incentive or ability to reduce their broker's commission because they were typically told that buyer brokerage was a free service.

96. For an unrepresented buyer who wants to put in an offer for a property and who must accept the listing broker's service of buyer representation, there is even less of a chance of negotiating a lower buyer broker's commission, for that commission is paid to the listing broker, who would have every reason to oppose it and is unlikely to transmit an offer that is conditional upon a cut to the commission the listing broker expects to receive.

97. The housing market has its highs and lows and wax and wane. It normally has a seller's market when there is more demand than inventory and a buyer's market when the opposite is true. In a competitive market that does away with the "ethical" rule of not allowing unrepresented buyers to make offers without first accepting the listing broker as a dual agent and with a mandatory buyer commission for each MLS listing, a seller certainly has incentive to offer to pay

some of the buyer's costs at closing (e.g., buyer's representation, land survey, mortgage points, home warranty, a year of condo fees), but a buyer always has the power and leverage in a buyer's market to make the seller convert an unwanted "freebie" to hard cash. Conversely, in a seller's market, the buyer must pay her own way on all these services *if she opts to use them*. Indeed, most buyers skip home warranties and land surveys, and some even skip inspections in buying a home. Skipping home inspections may not always be a good idea, but in a competitive market it is up to the vendors to prove their value to the buyers and up to the buyers to decide whether or not – and how much – to pay for the vendors' services.

98. Absent the rules created and enforced by the defendants, buyers would decide whether or not they need representation. Even in a buyer's market where sellers are incentivized to offer some "sweeteners" to prospective buyers by offering to pay for buyer representation, a buyer could simply make an offer that requests for some or all the incentives to be converted into a cash credit at closing.

99. Regardless of whether the buyers shop for their own representation or the sellers offer to pay for the representation as a kind of buyer incentives in a difficult market for sellers, they all would get to negotiate the rate for buyer brokerage, which would go up and down depending on the buyer's needs and market conditions. A first-time buyer might need more services and depend on her agent to handle inspections and find attorneys and land surveyors for her and could agree to a 4% commission rate, while a more experienced buyer might not need an agent at all or need her agent to do only some legwork in visiting open houses

and take some pictures on her behalf and might pay a flat $200 for each open house that her agent visits on her behalf. In a market where inventory slightly outstrips demand, it might serve the seller's purpose adequately to offer, say, $2000 in incentives for a buyer broker to "steer" the buyers to open houses at the property, whereas in a sharp market downturn the seller may be motivated to reimburse whatever the buyer agreed to pay her broker plus a 10% commission to the broker who brings in the buyer. In a competitive market, all these would be possibilities. But all these possibilities were taken away by the rules of "ethics" that the defendants relentlessly enforced.

100.    The "ethical" rules – and the defendants' conspiracy to implement them – harmed home buyers like Plaintiff grievously. Since 1987, the defendants' ironically named "ethical" rules no longer provided for realtors who represented sellers to pass on offers made by unrepresented buyers. As a result – and in contrast to the land survey, home inspection, home warranty, and mortgage markets – the buyer brokerage became a product that the defendants forced upon home buyers. In a seller's market, the buyers would have little power to resist the listing broker's demand of dual agency. Even in a buyer's market where the buyer otherwise might otherwise dictate terms, the listing broker would simply refuse on phony "ethical" rules to entertain an offer from a buyer who refuses to take the broker on as a dual agent.

101.    In more competitive but otherwise comparable foreign markets, homebuyers can forgo buyer representation completely in bidding for a home. When they choose to have brokers represent them, they set the price for buyer

representation directly with the brokers, and they pay less than half the rate paid to buyer-brokers in the United States.

102.    The defendants' conspiracy thus illegally forced an unwanted, tied good upon Plaintiff. It has also illegally and artificially maintained buyer broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the Internet and the diminishing role of buyer brokers. Indeed, the defendants have successfully stabilized buyer-broker commissions (and significantly increased the dollar cost) charged despite the diminishing role of buyer brokers.

103.    There is substantial economic evidence that the defendants' conspiracy has resulted in buyer-broker commissions and total commissions paid by home sellers that are inflated well above a competitive level nationwide. The total broker commissions in New York City and in areas where MLSs operate have stood at 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices (which led to larger commission amounts) and the decreasing role of the buyer broker in an age when many prospective home buyers have already scoured the market using Zillow or other websites.

104.    The United States General Accounting Office review of the residential real estate market reported that "commission rates have remained relatively uniform – regardless of market conditions, home prices, or the efforts required to sell a home." This remains true today. In fact, over the past two decades the average total commission on an annual basis has always been maintained

between 5.02 percent and 5.4 percent. It was at virtually the same level in 2017, as it was at the time of the GAO's analysis.

105.    The Consumer Federation of America, which has reviewed and criticized the brokerage industry's practices for many years, has indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear." The stability and maintenance of high broker commissions (and the substantial increase in actual dollar charges for their services) stands in stark contrast to the experience in other industries since the advent of the internet. The adverse economic impact of the conspiracy's restraints on price competition has been severe, and so has the harm that was done to Plaintiff as a home buyer.

## DEFENDANTS' PRODUCT TYING AND FALSE ADVERTISEMENT AND REPRESENTATION ABOUT BUYER BROKERAGE WERE DECEPTIVE AND UNFAIR BUSINESS PRACTICES AND HURT HOME BUYERS

106.    In addition to its restraint on interstate commerce, the defendants' conspiracy to implement and enforce NAR and REBNY's phony "ethics" rules that tied the home buyers' use of MLSs and RLS to their purchase of buyer brokers' service violates state consumer protection laws in statutes in Massachusetts, New York, District of Columbia and New Jersey.

107.    Until recently, home sellers and buyers, unlike brokers, did *not* have access to the universe of "blanket unilateral offers of compensation" being made to buyer-brokers. The defendants' rules and practice of setting the buyer broker's

commission at the time of the listing and not disclosing the figure to the buyer

broker's client before, during and even after closing were a huge part of their

wider anticompetitive conspiracy to inflate and artificially maintain a supra-

competitive price for buyer brokerage. But even if the non-disclosure of the price

of the buyer brokerage were not part of the wider conspiracy, the non-disclosure

would still be stand-alone and *per se* violations of consumer protection statutes in

Massachusetts, New York, District of Columbia and New Jersey as well.

108.     In purchases made in all these states and district, Plaintiff was told by the

defendants' subsidiaries, franchisees, employees, and members that he was going

to receive the buyer brokerage service for "free" and was never informed of the

true price he paid for it. Both the coercive sale and the fraudulent

misrepresentation about the true cost of the service, which NAR and some of the

co-defendants now publicly concede not to be "free", are flagrant violations of

state consumer protection statutes in New Jersey, Massachusetts, New York, and

D.C.

109.     NAR and REBNY instituted a series of rules, subsequently implemented

and enforced by the brokerage defendants, that ensured that commission offers

and private remarks were not disclosed through data sharing agreements with

third-party websites or other MLS syndication services. So although Plaintiff did

all his own Zillow searches and read the fine print of the MLS listings pooled by

Zillow, he did not find any disclosure of the compensation to buyer agents.

110.     To further mask and conceal their conspiracy to maintain supra-

competitive prices, the defendants trained and directed their licensees and

franchisees and affiliates to falsely advertise their services for buyers as free. From 2014 on, buyer agents or listing brokers who asked to be dual agents when Plaintiff wanted to submit bids for their listings as unrepresented buyers all toed defendants' lines and repeatedly represented to Plaintiff that their service was free to him.

111.    Indeed, until recently, NAR's ethical rule expressly permitted buyer-brokers to tell buyers that their services were free. NAR's Code of Ethics Standard 12-2 stated that "REALTORS may represent their services as 'free' or without cost." This is because the defendants created this ruse in which they left it to the home seller to set the commission rate for the buyer brokers and presented the seller as the purchaser of the buyer brokering service. In this elaborate ruse, the seller must be good sport and play the role of a patsy; not going along with the ruse meant all the buyer brokers would not bring their clients to her property.

112.    The reality is, of course, that buyer brokers, just like the mortgage brokers, lawyers, home inspectors, were all paid by Plaintiff on the day of closing. Yet, because of the elaborate lie and ruse, Plaintiff, like most other home buyers, were given to believe that he was not paying for anything.

113.    These misrepresentations and false advertisement misled Plaintiff and denied him the chance to set terms of his relationship with these buyer or dual agents and caused him to miss out on possible savings from negotiated rates of services he received from the buyer or dual agents. From the defendants' perspective, by disingenuously marketing their services as free, home buyers would not bother to negotiate buyer broker commissions or search for alternative

buyer brokers who might offer discounts. But the misrepresentation and deception are also stand-alone offenses under state consumer protection statutes.

114.    NAR and HSA violated Massachusetts General Law Ch.93A thanks to the product-tying and the false advertisement and misrepresentation about the cost of Plaintiff's buyer brokerage that he paid in a transaction in Massachusetts.

115.    NAR violated Massachusetts General Law Ch.93A thanks to the product-tying and the false advertisement and misrepresentation about the cost of Plaintiff's buyer brokerage that he paid in a second transaction in Massachusetts.

116.    REBNY, Compass, BHS, Halstead Real Estate and Douglas Elliman violated New York General Business Law §340, §349 and §350 thanks to the product-tying and the false advertisement and misrepresentation about the cost of Plaintiff's buyer brokerage that he paid in a transactions in New York.

117.    NAR, cXp and Compass violated Code of the District of Columbia §28–3904 thanks to the product-tying and the false advertisement and misrepresentation about the cost of Plaintiff's buyer brokerage that he paid in transactions in District of Columbia.

118.    NAR, Realty One, and Compass violated New Jersey Statutes § 56:8-2 thanks to the product-tying and the false advertisement and misrepresentation about the cost of Plaintiff's buyer brokerage that he paid in a transaction in New Jersey.


**DEFENDANTS' ANTITRUST CONSPIRACY HARMED PLAINTIFF AS A HOME SELLER**

119.    The defendants' anticompetitive conspiracy has imposed on home sellers

costs that may not otherwise exist and certainly would not exist at a high, fixed

percentage of the home value.

120.    In a competitive market, even when there is more inventory than demand

and when the sellers may be motivated to offer additional incentives to

prospective buyers like paid-for buyer representation, the home sellers would not

be saddled with a fixed, perennially unchanged commission rate for the buyer

agent. In a seller's market, the owner would have no reason to offer such

incentives at all. The defendants' conspiracy changed all that calculation and

stripped the owners their normal leverages and bargaining power in market

situations good or bad.

121.    The defendants used the access to MLSs and RLS to pressure sellers to set

an inflated buyer broker commission rate in their listings and conscribe the sellers

into the role of a patsy in the defendants' elaborate ruse to cheat and deceive the

buyers, and sellers would have no choice but to include the buyer broker

compensation in the listing (given the prospect of being denied access to MLSs if

they refused) and to set the rate at the high level of 2.5%-3% (given the prospect of

being blacklisted by buyer brokers who would steer their clients to other houses on

the market). But once the sellers played their part in the defendants' ruse to cheat

the buyers, it became the sellers' turn to play suckers, for artificially inflated

commission rate for buyer brokers also created enormous pressure for home sellers

to pay a similarly inflated rate to listing brokers.

122.    First, the inflated commission paid to buyer brokers created psychological

pressure on the seller to be "fair" to her own broker and compensate the listing

broker at the same rate as the buyer agent. Indeed, the MLSs and the form listing

agreements used by NAR subsidiaries and local affiliates as well as the brokerage

defendants often defaulted to equal commission rates for listing brokers and buyer

brokers. It would appear unseemly to the seller to suggest a deviation from that

default arrangement, especially after she has just proposed a 2%-3% commission

rate for the buyer broker.

123.    Second, it may be unwise for the seller to do so. If the buyer broker is

getting 3% as a result of the defendants' anticompetitive conspiracy and the listing

broker would get, say, only 1%, the seller may fear that the listing broker would

become less zealous in representing her interest in negotiating the price or during

the closing than the buyer broker does in representing the buyer. If the listing broker

were to "give away the store" in hassling over the result of the home inspection or

in negotiating certain contingencies and conditions of the sale, these items could

potentially hurt the seller a great deal worse than an extra 2% paid to the listing

broker.

124.    Third, it is public knowledge that most realtors work both sides and

simultaneously represent sellers as listing brokers and buyers as buyer brokers. As

long as their work as buyer brokers for other clients always bring in 2.5% or 3% as

a result of the defendants' anticompetitive conspiracy, paying them a lesser rate as

listing brokers may mean that they would not prioritize the sale of one's property

and focus instead on other clients. This would mean less open houses, less

showings, less leads being chased, and eventually a lower sale price or a longer

time idling on the market.

125.     The conspiracy inflated buyer-broker commissions, which, in turn, inflated the commissions for listing brokers. Plaintiff has overpaid tens of thousands of dollars in listing brokers' fees as a result of the defendants' conspiracy. Without the MLS rule mandating universal, unilateral blanket offer to buyer brokers, Plaintiff would have had no reason to stipulate a rate in his listing agreements with his listing broker; if the buyer brokers were all getting paid rates by their own clients and paid at, say, a rate of 1% or a flat rate of $3000, Plaintiff would have had no reason to pay his own listing broker 3%; if his listing broker was getting paid 1% or flat rate of $3000 in working as buyer broker for her other clients, Plaintiff would have had no reason to pay her 3% either.

126.     In short, the code of ethics adopted, implemented and enforced by the defendants' conspiracy has achieved exactly what it is designed to do: it has imposed significant overcharges on home buyers and sellers alike, it has maintained (and even increased) those overcharges over time notwithstanding technology changes that should have substantially reduced commissions, and it has significantly impeded the ability of lower-cost alternatives to create a more competitive marketplace.

127.     There was no pro-competitive justification for the defendants' efforts to enforce these "ethical" rules. To the contrary, the rules and the collective effort and conspiracy to police and enforce them were meant to restrain competition. The practice of asking sellers to specify in each MLS listing the fees that buyer agents get to charge the buyers is a blatant attempt to fix market prices, for there

would have been no reason for individual sellers to care whether and how much buyer brokers are compensated but for the fact that every other seller was forced to do the same thing (lest she be barred from listing her home on the MLS). Similarly, there would have been no reason for the seller to set the price at 2.5% or 3% but for the fact that every other seller was forced to do the same thing (lest a lower rate cause local buyer brokers to steer their clients to other properties on the market). By the same token, there would have been no reason for the seller to pay her own broker 2.5% or 3% but for the fact that the buyer brokers were being compensated at this rate and she would see less commitment and loyalty from her broker that might cost her more in unfavorable terms of sale or longer idled time on the market.

## CLAIMS FOR RELIEF

128.   The defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce that amounted to *per se* violation of the Sherman Act.

129.   The defendants are jointly and severally liable for the acts of their subsidiaries, employees, franchisees, and co-conspirators whether named or not named as defendants in this complaint.

130.   NAR and HSA further engaged in unfair and deceptive business practice that violated Massachusetts General Law Ch.93A.

131.   REBNY, Compass, BHS, Halstead Real Estate and Douglas Elliman further engaged in unfair and deceptive business practice and false advertisement

that violated New York General Business Law §349 and §350 and in contract or agreement that restrained trade in violation of §340.

132.    NAR, eXp, and Compass further engaged in unfair and deceptive business practice that violated Code of the District of Columbia §28–3904.

133.    NAR, Realty One, and Compass further engaged in unfair and deceptive business practice at violated New Jersey Statutes § 56:8-2.

134.    Plaintiff has been injured in his business and property and suffered damages.

135.    Plaintiff demands a jury trial and requests relief as follows:

A) that the Court award Plaintiff damages in an amount to be determined at trial;

B) that the Court award Plaintiff pre- and post-judgment interest;

C) that the Court award Plaintiff his costs of suit; and

D) that the Court award such other relief as the Court may deem just and proper.